UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Robert Ladd


        v.                          Civil No. 10-cv-182-JD
                                    Opinion No. 2011 DNH 066

Michael J. Astrue, Commissioner,
Social Security Administration


O R D E R

Robert Ladd seeks judicial review, pursuant to 28 U.S.C.
§ 405(g), of the decision of the Commissioner of the Social
Security Administration, denying his application for social
security disability benefits and supplemental security income.
Ladd contends that the Administrative Law Judge ("ALJ") erred in
failing to include mental limitations in the residual functional
capacity assessment, in adopting the state agency medical
consultant's opinion, in finding that Ladd could do his former
work as a cook, and in relying on the Medical-Vocational
Guidelines.  The Commissioner moves to affirm the decision.


Background

Ladd filed applications for social security benefits in
November of 2007 when he was forty-eight years old.  He alleged a
disability due to heart problems, poor sleep, limited ability to

do postural activities, and a limited ability to concentrate, remember, complete tasks, and get along with others.  Ladd completed a graduate equivalency degree in 1977 and served in the Air Force from April of 1977 until February of 1978.  He worked as a restaurant cook/chef from 1981 until 2007.

Ladd suffered a heart attack in August of 2007.  As a result, he underwent left heart catheterization with a stent in his right coronary artery.  He was discharged on August 28, 2007, with short-term restrictions on lifting and stair climbing.  He was advised to stay out of work for two weeks.  He participated in a cardiac rehabilitation program and was released to part-time work with lifting restrictions during September of 2007.  In October of 2007, Dr. Michael Hearne reported that Ladd's coronary artery disease was controlled and that he was making good progress.  Despite some subsequent issues, Ladd's heart condition remained stable.  He was prescribed pain medication for other pain issues.

Also in September of 2007, Ladd was noted to be slightly depressed.  Mental screening done on September 27, 2007, showed that Ladd was constantly on guard, watchful, and easily distracted.  Ladd reported that he felt numb or detached from other people, activities, and surroundings and that he had little interest in doing things.  He said that he felt depressed.

During the period after his heart attack, Ladd gained weight. Despite his weight at 228 pounds, Ladd declined a referral to a weight loss program. He also continued to smoke, although he had been advised to quit. He had additional diagnoses of depression and hypertension.

Because of a suspicion of obstructive sleep apnea, Ladd was referred to a pulmonary specialist. A CT scan showed an enlarged left parotid gland in the neck, which was considered to be consistent with inflammatory change. The sleep study showed severe obstructive sleep apnea and treatment, "CPAP titration," was prescribed.

In a form dated January 15, 2008, Ladd stated that he worked three hours each day and spent the afternoon exercising, walking, and cleaning his apartment. He said he had trouble sleeping. He took care of himself, drove, shopped, and handled his finances. He enjoyed reading, playing video games, walking, and swimming. He said that he could lift twenty to thirty pounds but that standing for long periods, walking for long distances, and climbing stairs caused him pain. He reported trouble with memory, concentration, and task completion. He said he could get along with authority figures, did not handle stress well, and had limited tolerance for "slackers."

Dr. Maura Sullivan, a psychologist, did a consultative examination of Ladd on May 6, 2008.  Dr. Sullivan noted that Ladd seemed frustrated and impatient, but he was generally cooperative.  Ladd told Dr. Sullivan that he had problems with memory, insomnia, low energy, and fatigue, and that he often thought about suicide.  He said that he worked part time with allowances for his limitations.  He also said that he worked slowly because he double and triple-checked his work, that he had yelled at his colleagues, and that he did not interact with customers.  He reported that he was able to manage his home and cared for himself.

On examination, Ladd scored in the severe range on the Beck Depression Inventory and in the moderate range on the Beck Anxiety Inventory.  He scored 29 out of 30 on the mini mental status examination and showed good attention and concentration. Dr. Sullivan diagnosed major depression with a single severe episode and obsessive compulsive disorder.  She found that he had intact ability to understand instructions and only a small impairment in understanding and memory.  She noted that he had difficulty with task completion because of fatigue and low energy.  She also noted that he would have difficulty adapting to a novel work environment because of his mood, interpersonal difficulties, and memory and task persistence issues.

4

On June 3, 2008, Dr. Hugh Fairley reviewed Ladd's records and completed a physical residual functional capacity assessment for the state agency reviewing Ladd's application.  Dr. Fairley determined that Ladd could lift or carry up to twenty pounds occasionally and up to ten pounds frequently and that he could sit, stand, and walk up to six hours during an eight hour day. He found that Ladd had an unlimited ability to push and pull but could only occasionally do postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling.  Dr. Nicholas Kalfas completed a psychiatric review technique form on June 10, 2008, and concluded that Ladd did not have a severe mental impairment.

In October of 2008, Dr. Hearne referred Ladd to the Veterans Administration Medical Center mental health department where he was diagnosed with depression and anxiety, which was manifested by depressed mood, mood swings, low motivation, inability to work full time, poor sleep, fatigue, constricted affect, fluctuating hopelessness, and dysphoric mood.  He was also diagnosed with an adjustment disorder and moderately severe depression.  His medication was changed to avoid exacerbating his depression. Ladd also began to take a mood stabilizer medication in November of 2008.

Dr. Hearne completed a cardiac residual functional capacity questionnaire on December 31, 2008.  Dr. Hearne explained his treatment relationship with Ladd, which began in September of 2007, and reported that Ladd's symptom was fatigue.  He said that Ladd had no chest pain but that stress was a significant factor in causing his fatigue and that he was preoccupied with his cardiac condition.  Dr. Hearne declined to decide whether Ladd was a "malingerer" but noted that Ladd perceived limitations from his symptoms and that his emotional factors contributed to his subjective symptoms.  He also noted that Ladd's symptoms were severe enough to interfere with his concentration and attention constantly.

Dr. Hearne wrote that Ladd's physical impairment was mild and was not consistent with Ladd's subjective symptoms and perceived limitations.  In Dr. Hearne's opinion, Ladd was capable of working at a low stress job.  Dr. Hearne found that Ladd could sit for four hours and stand or walk for two hours in an eight-hour work day with unscheduled breaks totaling thirty minutes during the work day.  He said that Ladd could lift and carry ten to twenty pounds occasionally and less than ten pounds frequently, could not stoop or crouch, would need certain environmental restrictions, and would be absent from work more than four times each month.

6

Ladd was examined by Dr. Hearne in January of 2009.  At that time, Dr. Hearne noted that Ladd had had one episode of chest discomfort since October of 2008, which was due to emotional stress.  Dr. Hearne wrote that Ladd's cardiac status was relatively stable.  In July of 2009, Dr. Hearne noted that Ladd continued to have episodes of chest tightness which might be caused by angina.  Ladd undertook a Myocardial Perfusion Study in August of 2009 but was not able to complete the test because of a lack of coordination and some shortness of breath.  The results of the test were mild left ventricular systolic depression and an ejection fraction of 52%.

Ladd's mental health records from January through October of 2009 document his irritability and other issues for which his medication doses were adjusted.  On October 9, 2009, Ladd's treatment notes show a diagnosis of mood disorder, not otherwise specified, with irritability and social relationship challenges. Although he was prescribed antidepressants, he stopped taking them because he did not like the way he felt.

The ALJ held a hearing on October 14, 2009.  Ladd was represented by counsel and testified at the hearing.  Ladd testified that his heart attack had limited his ability to work because he was not able to lift, concentrate, or function as he could before the heart attack.  He listed symptoms and

7

limitations of shortness of breath, palpitations, chest pain,
memory problems, inability to multi-task, depression, mood
swings, irritability, inability to get along with others,
fearfulness, lack of enjoyment, and pain in his hip.  He also
said he reacted more to stressful situations than he had in the
past.  He said his medications caused dizziness, nausea, and
sleeplessness.  He said that he had to recline for his heart
symptoms and that he was being treated for depression.

Ladd described his part-time work schedule, including that
his employer let him come and go as he wanted to and take breaks
as needed.  He said that other than working, he took care of his
home, went to the library, socialized with his son, took care of
his car, and walked downtown and back.  He said he avoided
driving long distances because it caused stress.

The ALJ found that Ladd had severe impairments of
unspecified mood disorder, coronary artery disease, and obesity.
Despite his impairments, the ALJ assessed that Ladd had a
residual functional capacity to perform light work with only
occasional postural activities.  He found that Ladd's mental
impairments did not restrict his activities of daily living,
caused moderate difficulties in social functioning, and mild
difficulties in concentration, persistence, and pace.  Based on
his residual functional capacity assessment, the ALJ concluded

8

that Ladd could do his former work as a cook.  Alternatively, the
ALJ relied on the Medical-Vocational Guidelines, Rules 202.14 and
202.21, to conclude that Ladd could do other jobs.  As a result,
the ALJ found that Ladd was not disabled.

The Decision Review Board selected Ladd's case for review.
When the Board did not complete its review within the time
allowed, the ALJ's decision became the final decision of the
Commissioner.

### Standard of Review

In reviewing the final decision of the Commissioner in a
social security case, the court "is limited to determining
whether the ALJ deployed the proper legal standards and found
facts upon the proper quantum of evidence."  <u>Nguyen v. Chater</u>,
172 F.3d 31, 35 (1st Cir. 1999).  The court defers to the ALJ's
factual findings as long as they are supported by substantial
evidence.  § 405(g).  "Substantial evidence is more than a
scintilla.  It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion."  <u>Astralis</u>
<u>Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev.</u>, 620 F.3d 62,
66 (1st Cir. 2010).

Disability, for purposes of social security benefits, is
"the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months."  20 C.F.R. § 404.1505(a).  The ALJ follows a five-step
sequential analysis for determining whether an applicant is
disabled.  20 C.F.R. § 404.1520.  The applicant bears the burden,
through the first four steps, of proving that her impairments
preclude her from working.  Freeman v. Barnhart, 274 F.3d 606,
608 (1st Cir. 2001).  At the fifth step, the burden shifts to the
Commissioner to show that work that the claimant can do, despite
her impairments, exists in significant numbers in the national
economy.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).


## Discussion

Ladd contends that the decision denying him benefits must be
reversed and remanded.  He argues that the ALJ erred in failing
to include mental limitations in the residual functional capacity
assessment, erred in relying on Dr. Fairley's assessment done in
May of 2008 before Ladd's records were complete, erred in finding
that Ladd could return to his former work as a cook, and erred in
relying on the Medical-Vocational Guidelines.  The Commissioner
responds to Ladd's arguments and asks that the decision be
affirmed.

A.  <u>Residual Functional Capacity</u>

Ladd faults the ALJ for failing to include a mental limitation in the residual functional capacity assessment after finding, at Step Two of the sequential analysis, that he had severe impairments.  The Commissioner contends that a finding of a severe impairment at Step Two and moderate limitations at Step Three do not require the ALJ to include those limitations in a residual functional capacity assessment.  In his reply to the Commissioner's motion, Ladd contends that the ALJ made findings at Step Three that he had moderate limitations in social functioning.

At Step Two of the sequential analysis, the ALJ considers "the medical severity of [an applicant's] impairments."  20 C.F.R. § 404.1520(a)(4)(ii).  The applicant bears the burden of showing the existence of "a medically severe impairment or combination of impairments."  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).  To meet the Step Two requirement, an applicant must make only a de minimis showing that his impairment or combination of impairments would have more than a minimal limiting effect on his ability to work.  <u>McDonald v. Sec'y of Health & Human Servs.</u>, 795 F.2d 1118, 1124 (1st Cir. 1986).

At Step Three, the ALJ considers the medical severity of the applicant's impairments in the context of impairments that are

deemed to be disabilities, which are listed in 20 C.F.R. Part
404, Subpart P, Appendix 1 ("Listing of Impairments").  Id.
§ 404.1520(a)(4)(iii).  The ALJ must determine whether the
applicant's impairment or combination of impairments meet or
equal any of the listed impairments.  Id.  If the applicant's
impairments do not meet or equal a listed impairment, the ALJ
moves to Step Four.  An ALJ's finding of a severe impairment at
Step Two does not obligate the ALJ to include that limitation in
the residual functional capacity, which is based on different
considerations.  See Davis v. Astrue, 2009 WL 3241853, at *5
(W.D. Pa. Oct. 5, 2009); Augusto v. Comm'r of Social Security,
2008 WL 186541, at *3-*5 (M.D. Fla. Jan. 18, 2008).

At Step Four, "the ALJ will assess and make a finding about
["the applicant's] residual functional capacity based on all the
relevant medical and other evidence in [the] case record."
§ 404.1520(e).  The residual functional capacity assessment is
then used at Steps Four and Five to determine whether there is
work the applicant can do.  Id.  An applicant's residual
functional capacity "is the most [he] can still do despite [his]
limitations."  § 404.1545(a)(1).  In making that assessment, the
ALJ "will consider all of [the applicant's] medically
determinable impairments of which [the ALJ is] aware, including
[the applicant's] medically determinable impairments that are not

12

'severe,' as explained in §§ 404.1520(d), 404.1521, and 404.1523
. . . ."  404.1545(a)(2).

    In making the residual functional capacity assessment in
this case, the ALJ considered the effects of Ladd's mental
impairments on his ability to work.  The ALJ explained that the
criteria considered for purposes of Step Three do not provide a
residual functional capacity assessment and, instead, that "[t]he
mental residual functional capacity assessment used at steps 4
and 5 of the sequential evaluation process requires a more
detailed assessment by itemizing various functions contained in
the broad categories found in paragraph B of the adult mental
disorders listed in 12.00 of the Listing of Impairments (SSR 96-
8p)."  Based on that guidance, the ALJ assessed Ladd's residual
functional capacity with respect to the degree of Ladd's
limitations due to mental function.

    The ALJ noted that Ladd claimed he had problems with memory
but found that Ladd was able to work part time, go to the
library, finish activities that he started, and go places without
reminders.  The ALJ also found that Ladd's work as a cook showed
that he could sustain concentration on work for more than the
thirty minutes he claimed.  The ALJ further found that Ladd's
previous social difficulties had resolved, as evidenced by Ladd's
decision in 2009 that he no longer needed medications to address

that issue.[1]  Having found no restriction on Ladd's ability to
work caused by his mental impairment, the ALJ did not include a
limitation in the residual functional capacity related to mood
disorder.

Ladd argues, nevertheless, that limitations based on a
mental disorder were required because the ALJ found he had a
"severe impairment" due to mood disorder at Step Two and
determined that he had moderate difficulties in social
functioning at Step Three.  Ladd also argues that Dr. Hearne
stated that Ladd was limited to low-stress work and that the ALJ
failed to consider or include that limitation.  As the ALJ
explained, while Ladd was determined to have mental limitations,
those limitations did not negatively affect his ability to work
to the extent that mental limitations were necessary in his
residual functional capacity.  The ALJ also noted that Dr. Hearne
believed that Ladd's difficulties were caused by Ladd's own
perception of his limitations, which were not consistent with the
medical record. Therefore, the ALJ's evaluation of Dr. Hearne's
opinion is appropriate and supported by the record.

---

[1]The ALJ did not disregard Dr. Sullivan's opinions based on
her examination in May of 2008, as Ladd charges.  Instead, the
ALJ credited Dr. Sullivan's opinions and concluded that Ladd had
moderate difficulties in social functioning.

The ALJ properly considered the medical evidence pertaining to Ladd's mental impairments and determined that they did not restrict his residual functional capacity.

B.  <u>Agency Medical Consultant's Opinion</u>

Ladd contends that the ALJ erred in relying on the opinion of Dr. Hugh Fairley, the agency medical consultant, because he only reviewed part of Ladd's medical records, those existing before June of 2008.  Ladd notes that he had additional treatment at the Veterans Administration Medical Center from November of 2008 to October of 2009.  Ladd asserts that the ALJ incorrectly stated that Dr. Fairley had the opportunity to review Ladd's medical records when the record shows that he did not review all of Ladd's records.  He argues that the additional records from the Veterans Administration Medical Center would undermine Dr. Fairley's opinions that Ladd had done well and had not had chest discomfort since October of 2007.

In addition to Dr. Fairley's opinion, the ALJ gave Dr. Hearne's opinions great weight, to the extent that his evaluation of Ladd's limitations was consistent with a residual functional capacity for light work.  Dr. Hearne treated Ladd during the period after Dr. Fairley reviewed the medical records and completed a Cardiac Residual Functional Capacity Questionnaire

dated December 31, 2008.  In the Questionnaire, Dr. Hearne
indicated that Ladd could lift twenty pounds occasionally and
less than ten pounds frequently and could sit, stand, or walk for
six hours during an eight-hour work day, while Dr. Fairley found
that Ladd could lift and carry ten pounds frequently.[2]

In some circumstances, an ALJ is required to give a treating
physician's opinion more weight than an opinion of a non-treating
physician.  20 C.F.R. § 404.1527(d).  On the other hand, if the
ALJ finds that the treating physician's opinion is inconsistent
with the medical evidence, that opinion may be rejected to the
extent of its inconsistency.  See Partridge v. Astrue, --- F.
Supp. 2d ---, 2010 WL 4882018, at *5 (D. Mass. Dec. 1, 2010);
Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002).
Resolving evidentiary conflicts is the province of the ALJ.
Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765,
769 (1st Cir. 1991).

The ALJ explained in his decision that Ladd's own assessment
of his abilities showed that he could do considerably more than
Dr. Hearne found in his assessment and that Dr. Hearne's

---

[2]The relevant distinctions between the two assessments
appear to be whether Ladd was able to lift and carry ten pounds
frequently or only less than ten pounds frequently, whether Ladd
required postural limitations as assessed by Dr. Hearne, and his
likely absenteeism rate.

assessment included limitations based on Ladd's subjective
perceptions rather than limitations based on medical evidence.
The ALJ noted that Dr. Hearne found that Ladd had only mild
physical impairments and that Dr. Hearne concluded that Ladd's
perceptions of his impairments were not reasonably consistent
with his medical condition.  Given the well-explained and
persuasive basis for the ALJ's residual functional capacity
assessment, based on both Dr. Fairley's opinion and Dr. Hearne's
more recent opinion, the ALJ did not err in giving weight to Dr.
Fairley's opinion, although it was based on Ladd's medical
records up to June of 2008.


C.  Past Relevant Work

     At Step Four, the ALJ considers whether the applicant can
return to his former work.  20 C.F.R. § 404.1520(f).  The
applicant bears the burden of showing that he cannot return to
his former work.  Gray v. Heckler, 760 F.2d 369, 375 (1st Cir.
1985).  To succeed, the applicant must show that his impairment
or impairments would prevent him from returning both to his
particular job and to that type of work generally.  Dudley v.
Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir.
1987); see also Santiago v. Sec'y of Health & Human Servs., 944
F.3d 1, 5 (1st Cir. 1991).

17

The ALJ concluded, based on Ladd's residual functional capacity for light work, that he could return to his former work as a chef.  The ALJ acknowledged that Ladd's description of his former job required work at the medium exertional level but cited an occupation in the Dictionary of Occupational Titles ("DOT"), § 313.131-014, as a similar job at the light exertional level. Ladd contends that the ALJ erred because he was not capable of work at the light exertional level and because the occupation the ALJ cited was for a chef, while his former work was as a cook, which requires work at the medium exertional level.

The ALJ's residual functional capacity assessment is affirmed.  Therefore, to the extent that Ladd argues that his residual functional capacity is not at the light exertional level, his argument fails.

Alternatively, Ladd contends that the ALJ erred in relying on the occupation he cited in the DOT as work Ladd could do. Ladd argues that he identified his former work as that of a cook, while the DOT occupation cited by the ALJ was for a chef.  The occupation cited by the ALJ is titled "Chef," DOT § 313.131-014, while the job of "Cook" is defined at DOT § 313.361-014 and is listed at the medium exertional level.

During the hearing, Ladd's counsel asked him, "Now, when you were working before the heart attack, you were working 20 plus

18

years as a chef?"  Admin. Rec. at 31.  Ladd answered, "Yes, sir."
Id.  Ladd further explained that he was considered "a working
chef," that he "was in charge of many of the line cooks, prep
cooks, dish washers, bus people, anything to do with the kitchen
staff."  Id.  He testified that in some places he "ran the whole
operation and other places [he] was assistant to the chef . . .
."  Id.  He also testified that he stocked shelves, washed
dishes, and did clean up.  In his disability report, however,
Ladd described his former work as "cook" and stated that he did
"everything involved with cooking," which included walking and
standing for seven hours each day, lifting weight up to fifty
pounds, and supervising other people.

   A comparison of the two DOT definitions shows that the
"Chef" job requires supervising, coordinating, and participating
in the activities of cooks, while the "Cook" job requires cooking
activities and may include, but does not require, supervision of
others.  Based on Ladd's testimony that he was a "working chef,"
which included supervising others and sometimes running the whole
operation, and the DOT descriptions, Ladd has not shown that the
ALJ erred in relying on the DOT occupation for "Chef."

D.  <u>Medical-Vocational Guidelines</u>

At Step Five of the sequential analysis, the Commissioner bears the burden of showing that there are jobs that the claimant can do despite his impairments.  <u>Seavey</u>, 276 F.3d at 5.  The Commissioner can satisfy the burden at Step Five by the use of a chart, the Medical-Vocational Guidelines ("Grid"), when the claimant's limitations are exclusively exertional.  <u>Id.</u>  When a claimant also has non-exertional limitations, however, the Grid may only provide a framework for the decision and is applicable only when the non-exertional limitations do not significantly restrict the claimant's ability to do work at the designated exertional level.  <u>Id.</u> at 6-7; <u>Heggarty v. Sullivan</u>, 947 F.2d 990, 996 (1st Cir. 1991).

In this case, the ALJ found at Step Four that Ladd could return to his former work but also made an alternative finding at Step Five based on the Medical-Vocational Guidelines.  The ALJ found that Ladd was capable of a full range of light work and concluded that he was not disabled, based on Medical-Vocational Rules 202.21 and 202.14.  The ALJ further concluded that even if Ladd were limited to unskilled work, due to his psychological and memory issues, under Rules 202.20 and 202.13 he would not be disabled.

Ladd challenges the ALJ's decision on the ground that the record shows that he had mental impairments which preclude the use of the Medical-Vocational Guidelines.  As is discussed above, the ALJ's residual functional capacity assessment, without mental limitations, is affirmed.  In addition, to the extent Ladd argues that the ALJ should have included a limitation for low stress work, as suggested by Dr. Hearne, the ALJ addressed that limitation in the analysis.  Therefore, the ALJ properly relied on the Medical-Vocational Guidelines to support his determination that Ladd was not disabled.

<u>Conclusion</u>

For the foregoing reasons, the claimant's motion to reverse (document no. 10) is denied.  The Commissioner's motion to affirm (document no. 12) is granted.

The decision of the Commissioner is affirmed.  The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

April 19, 2011

cc:  Raymond J. Kelly, Esquire
     Gretchen Leah Witt, Esquire

21